Okay, the next case is number 14-1001, Peer Bearing Company, Changsh v. United States. May I please record? In the underlying proceeding, in its initial set of questionnaires, the department requested that CPV provide its U.S. sales data and define two types of U.S. export price sales and constructed export price sales. Pursuant to the department's definition and consistent with the statute, U.S. sales are typically classified as export price sales when the first sale of subject merchandise is between a foreign producer or exporter and an unaffiliated purchaser. U.S. sales are typically classified as constructed export price sales when the first sale to the unaffiliated U.S. customer is through a U.S. affiliate. In responding to this initial questionnaire response, CPV chose to report its sales as constructed export price sales despite the fact that other information on the record demonstrated that the first sale of subject merchandise was between a CPV and an unaffiliated purchaser and thus fell within the definition of... Is it your view that the first request should have put them on notice they had to keep the data regarding both CEP and EP? Correct, John. Not only did it put them on notice, but that first request specifically requested that EP sales data based on the request that they provide U.S. sales and provided the definition of how the U.S. sales should be treated. So from the outset, they should have, if they were to fully comply with the department's request, they should have provided the sales data between themselves and the unaffiliated purchaser. They, of course, could have chosen to provide that as well as the CEP prices and continue to argue that the sales were appropriately classified as constructed export price, but they knew from the outset that this information was relevant and had been requested by the department. So as has been discussed, they essentially provided one set of sales data despite the fact that a different set of sales data fell within the purview of the... If I didn't think that the request on its face was actually a request that caused them to produce EP price data, I didn't read it because I feel like, quite frankly, you're going a little far in your understanding of what that request actually did expressly ask them to do. But nonetheless, and I don't understand this area of the law very well, so if I say something wrong, correct me. Is it true that both EP or CEP could reasonably use to calculate U.S. import price in various circumstances? Correct, Your Honor. Those are two different classifications depending on the course of sales that are present in the review. So is it your belief that whenever an administrative proceeding is ongoing that it's going to require an analysis of U.S. import price that the importer ought to be required to maintain its data on both EP and CEP? Correct, Your Honor. This case presents a somewhat uncommon situation because of the different sales steps. So every case may not give rise to a situation where there would be export price and constructed export price sales, if that makes sense. But certainly in a situation where it is unclear and there were these multiple steps, a respondent should maintain both sets of sales data to ensure that they are able to fully comply with any of the questions. So to be clear, not every administrative review, if there was a simple one that didn't have all these sales steps, would necessarily require a rule that all CEP and EP data have to be at U.S. import price, clearly required that. To be clear, the obligation to not maintain both sets would arise when both sets just simply didn't fit. For example, there was no downstream sales. It was simply from the foreign producer to the unaffiliated purchaser. Nothing else was at issue. There were no subsequent sales after that and thus there would only be that one set of sales data and thus there would be no CEP sales to maintain if that's clear. So in addition to this initial request, it was then raised by Timken during the proceeding, the absence of this information from the record and Timken advocated that these sales should properly be classified as export price sales. Now Timken raised this in comments to the Commerce Department and then again raised it in its case brief to the administrator during the administrative proceeding. Both of these submissions were made prior to CPV's sale to SKF and thus when CPV still had control over this information. Then moving forward, Commerce ultimately agreed with Timken that the sales were properly classified as export price sales and CPV initiated litigation with the issue of this sales data and the Under this circumstance, where from the outset U.S. sales were requested, this type of information is at the center of any anti-dumping duty proceeding and specific issues have been raised about the reporting and about this data. Commerce's application of adverse facts available based on CPV's failure to maintain this information is reasonable and otherwise in accordance with law. It's also consistent with this court's case law on this issue. In Nipple and Steele, this court reviewed the issue of the application of adverse facts available and noted that two showings must be made in order for AFA to be applied. First, a reasonable and responsible respondent must be aware that the information at issue is the type of information that should be maintained and second, the respondent must be shown to have failed to cooperate to the best of its ability by failing to either maintain this information or in failing to exert its maximum effort to obtain it. Both of these showings are present here. As was discussed, this information is specifically the type of information that the department relies on during the proceedings so the respondent was aware that this information is relevant. Can Twyce actually tell Commerce that they ought to be requesting EP data and that that's the data that ought to be used to come up with U.S. import price so that the other side was unnoticed? Exactly, Your Honor. Tim can raise this issue twice and again, both of these submissions were filed prior to CPV's fail to ask AFR. At what point in the proceedings does the requirement to maintain the records attach? The obligation to maintain the information, this court in Nipple and Steele indicated that the respondent has an obligation to maintain any information that they reasonably anticipate Commerce might request. Certainly, a respondent that's under an order, they won't know whether they're going to be participating in an administrative proceeding until requests have been submitted and a review has been initiated. Building up to that time, this information should be maintained in case a review moves forward and Commerce is able to request information from interested parties at any point during the proceedings. Throughout the life of an administrative review, there is a chance that information could be requested unless the respondent has an obligation to maintain this information in case it's requested. Here, we have a situation where there's litigation initiated and so because these issues were potentially still live and Commerce had the ability on remand to reopen the record, that obligation continues throughout the life of the judicial review, particularly the situation here where the information issued is at the center of the litigation. In addition to Nipple and Steele, this court also affirmed Commerce's application of adverse acts available based on the respondent's failure to provide information during a remand where it was requested during a remand proceeding in Todd-Chen. Now, in affirming Commerce's application of ASA, the court noted that it was reasonable that Commerce should have expected that the respondent should have maintained this information and that by failing to maintain the information, the respondent bore the risk that Commerce requested. In Todd-Chen, the facts were flipped, right? In Todd-Chen, they didn't keep EP, but they kept CEP here and in Todd-Chen, it was the other way around. You're correct, Your Honor. In Todd-Chen, the respondent there, Todd-Chen, had submitted export price sales and Commerce ultimately determined that constructed export price sales were the appropriate basis. I would also note that the basis of... Can I read those cases for the proposition that when both of them are potentially an issue, the contractor has an obligation to maintain evidence with regard to both? Yes, Your Honor. In both that case and here, there was this question about what the appropriate sales were and again, we're talking about the information that's at the very heart of the dumping determination, the U.S. sales. That information is clearly relevant to the Commerce Department and particularly in a situation like this and in Todd-Chen where there could be arguments on either side. Can I ask a question? I understand that they did not argue this exactly the way I'm about to say it, but why doesn't Todd-Chen potentially help them in that Todd-Chen said in a scenario like this, it's actually CEP that you ought to be focusing on, not EP. That's the better one to use and so why wouldn't that provide... And I realize we did not make this argument, but why wouldn't that provide for them an argument that, well, we kept CEP because after Todd-Chen, we understood that was what was to be an issue in a scenario like this? Your Honor, the facts in Todd-Chen were slightly different and so it's not exactly in that respect on all fours with our case. The issue in Todd-Chen was whether or not a particular party's son was affiliated with Todd-Chen. Now, Todd-Chen had initially reported its sales as EP sales under its belief that there was no affiliation between it and son. However, Commerce changed its statute of change regarding affiliation and so Commerce now raised questions about, well, maybe Todd-Chen and son are affiliated and if they are affiliated, then the appropriate sale is CEP sales. I don't believe the respondent in Todd-Chen argued that if it was in fact affiliated with son that CEP sales weren't appropriate. The issue there was whether or not there was affiliation. Here, we don't have an issue. Here, we have a sale. I'm not going to pretend to understand everything you just said, but what I did get out of it is the choice between EP and CEP is very fact-specific in a given case. Correct. Is that a fair statement? Yes. Okay. I don't know if there are any questions at this point. I would like to reserve the remainder of my time for rebuttal. Okay. Thank you, Michelle. Ms. Correa? Good morning. My name is Diana Correa representing Plaintiffs' Affiliate, Peabody & Company. I would like to start by saying that the lower court was not in error when it demanded that Commerce's Department determination to apply adverse facts available on the basis of a respondent's inability to provide certain price information on remand for the first time, even though Commerce never requested that information during the proceeding, nor did it give an indication to the respondent that the information would be necessary to calculate the margin. And the issue with Timkin's argument is that it suggests that the respondent's inability to provide certain information in itself is the basis for the application of adverse facts available. And that is a very broad interpretation of Section 1677E, because what this statute requires are two requirements, two independent findings. So the first finding under Subpart A of 1677E is that the Commerce determined that information is unavailable or that the party failed to provide the information. And the second finding that is separate and also necessary is that there was a lack of cooperation. And in the language of the statute, Commerce must show that the party failed to cooperate to the best of its ability to comply with a request for information. Now here, the mere inability of CPC to provide this data on remand was the basis for both Commerce's decision to apply to resort to facts available and not use the data on the record, and to apply an adverse influence. This is a very broad interpretation of the statute that practically makes it impossible for respondents to avoid the application of On the one hand, Timken interprets the statute to mean that there is an open-ended obligation on duties, on parties, open-ended duty on parties, excuse me, to maintain records of information that was never requested on the off chance that this may be necessary sometime in the future, which could be years later after the administrative proceeding ended. Well, but Timken is not making that argument for the first time in this Court, because that's what was at issue in Nippon and Ta-Cheng also. There were similar facts, and undoubtedly the Court in both cases adopted a standard that required maintaining things even before they had been requested. So I don't, I mean, I feel like your argument, you may have an argument for why you didn't have to maintain this data, but it can't be the distinction of it hadn't yet been requested, because Ta-Cheng and Nippon said you can anticipate certain kinds of things being relevant, and if a reasonable contractor or reasonable importer, there was some language they used, would know that it was going to be relevant and had to be maintained. Well, there is a critical distinction between this case and Nippon, Steele, and Ta-Cheng. Just to recount briefly the fact of Nippon, Steele, and Ta-Cheng, and in both of these cases, the information was requested by Commerce during the proceeding. In Nippon, Steele, and Ta-Cheng, that doesn't seem to be the case. It came after remand. The majority doesn't clearly say the information was first requested, and the dissent points out, and points you back to the brief, that in fact, the first request did not contain it. So I guess I'm having trouble understanding that particular, you made it in your brief, and I'm not going to say it's a misrepresentation, because if I read only the majority's view, I would be confused about whether the first request included it or not. But the dissent says quite clearly it did not request it first. So, I mean, another distinguishing factor with Ta-Cheng is that in Ta-Cheng, the issue was a question of affiliation. And that was raised by petitioners in Ta-Cheng in the first administrative review. It was Commerce had that argument before it. It did not act upon it. In the second administrative review, again, Ta-Cheng reported its information on an expert price basis, as if there was no affiliation. In the third review, three years later, petitioners again raised that argument. At that point, Commerce sent Ta-Cheng a supplemental questionnaire asking questions about its potential affiliation. So if the argument is, and it applied, it made this adverse decision against Ta-Cheng in the preliminary results of that third administrative review. Now, so the distinction between this case and Ta-Cheng is that the respondent in Ta-Cheng had known that this could be an issue for three years prior to the adverse decision that was made by Commerce. In this case, Timkin made the comment that, yes, Commerce should actually request EP prices and not CEP prices. In those same comments, Timkin also made a comment that CPV should not be entitled to a separate rate. It made other comments regarding the factors of production. Now, Commerce obviously took notes of those comments, but in the preliminary determination, it used the prices as reported by CPV. At that point, CPV had no indication that its methodology was being questioned by Commerce, that it was not accepted by Commerce. Moreover, after the preliminary determination, Commerce issued a post-preliminary supplemental questionnaire to clear up any factual issues that it still had. In that supplemental questionnaire, it asked CPV for factors of production information. It didn't ask one single question about affiliation, about the question of export price versus constructed as export price. Of course, Timkin did raise the issue again in its brief. At that time, the parties had no expectation that Commerce would not accept the CEP data on the record. More to the point, in the prior reviews of this order in which CPV had participated, it had always reported prices on a CEP basis because it was selling to the United States market through a US reseller that was affiliated, a peer bearing company. In all of these prior reviews, Commerce accepted the CEP methodology. There was no question that these were not transactions between affiliated parties. For the first time in this case, at the very last moment, Commerce changed its mind. The fact that it changed its mind at the very last moment is very obvious from what it decided to do. Instead of asking CPV to provide information on the record, EP prices, in case they need it for the final determination, what Commerce did was something completely out of the ordinary. It took two purchase orders that were on the record. It computed a ratio between the price between CPV and the unaffiliated importer and the seller, and used that ratio to adjust all of the prices in the database. It was a methodology that was completely unauthorized by statute. Can I ask you, in the final determination, Commerce, for the first time, used CEP, right? Correct. Got that right? Okay. By my calculation, that was four months and 11 days after CPV was sold. Is there any evidence in this record that your company made a good faith attempt to immediately preserve or go to them and preserve EP? As of the final determination, you were on notice that EP price was something Commerce was looking at. At that point, unquestionably, there had to be some onus on you to figure out if the EP data existed. Is there anything in this record about that? Well, to impose that type of notice would require a sequence of logical steps to happen, which actually happened in this case. That would mean, first, that there would be a remand, which CPV didn't presume would be the case, that there would be a remand, that the record would be reopened to accept new information. That is a rare occurrence on remand, because typically the cases are decided based on the information on the record. Most important, CPV at the time, the ownership had already transferred, but CPV had already taken steps to preserve the information. It had collected information on its own, but also it had secured an agreement with the new owners of CPV through the master purchase agreement to have access to the data relevant to the dumping reviews if that information was to be requested. It was requested here. CPV availed itself of this contractual obligation of the new owners and went on to request the data. The fact that the new owners could not provide the data to us doesn't erase the fact that CPV had taken steps to preserve it, to gain access to it, and had taken all the steps a reasonable respondent would have done. That does not nullify the fact that it had cooperated to the best of its ability. More access, let's say a more reasonable respondent than that, I don't know what it could have done more than CPV had done here. If you were asked to craft a general rule about when a party such as this falls under an obligation to maintain its information and its records, what would that be? What would your rule look like? My rule would be based on what the existing cases suggest, and the existing cases that deal with maintenance of records, look at maintenance of records that support questionnaire responses or support verification of questionnaire responses or refer to data that was requested during the administrative review. Again, to impose a duty to maintain records indefinitely of information of any type is quite unreasonable. But that would be a very large volume of records, would it not, if you're establishing all of the considerations that go into these calculations? You're saying that any exporter to the United States just can't dispose of any manufacturing records or whatever might be, subsidy records, transportation records, anything that could conceivably be later announced to be relevant and require any, let's say, bona fide purchaser to do the same with the prior records? That is the logical conclusion of what Timkin's position is, which is if you have such an open-ended obligation to maintain records, it's simply impractical to deal with it because dumping calculations are extremely complex. There are factors of production, especially involving non-market economies as this case is. There are factors of production for a myriad of material inputs that need to be collected to prepare the questionnaire responses. And if we're going to data that was not even used to prepare that questionnaire response, which is here the EP data, the universe is very large. I would simply also note to the each observation, a company at verification is required to substantiate each of the, let's say, variables that are on that observation. Is that in fact the position here, or are you looking only for the transfer price to the initial purchaser in the United States? Is there in fact a basis, certainly the Court of International Trade thought that Commerce was asking too much? Yes, Your Honor. CPV agreed. Commerce was expecting that CPV would preserve records for information that it did not use to prepare its questionnaire responses. But nothing was preserved, I gather. No, there was information preserved. For example, all of the U.S. sales data resided in the United States at Peer Bearing Company, which was under the old ownership of CPV. All of that data was preserved. The question here is that export price data was kept in China, a small company in a relatively small town, where at the time of the 2006-2007 transactions, some of this information was kept manually. So the company did preserve records that it thought were necessary, records that it had. It just couldn't anticipate all of the possible information it would need from China. But still, I gather nothing at all was preserved. Is that correct? I'm sorry, Your Honor? I gather that nothing was preserved. The company did preserve certain data, and in fact, it was able to provide... CPV did? CPV, yes. Did preserve certain data? Yes, did preserve certain data. It just didn't have a complete database of 11,000 observations with EP prices. How many did it preserve and supply in response to requests? Oh, I couldn't... We thought it was zero. That was my recollection. It was zero. So I think there's a big difference between it preserved some of 11,000 and it provided zero. So I want to know whether I'm misremembering the facts. No, it preserved some of the information, some of the underlying documents. It didn't preserve, it didn't have a complete database. What it did, it went to the current owners of CPV, to SKF, because it had this ability under the Master Purchase Agreement to ask SKF to generate a database. SKF indicated that it had queried its records and the information was not available, and it offered a series of reasons why that was the case. Can I ask one more question? Earlier, you said something in response to my question about the sale, and was there any obligation to maintain documents? And I thought that you had said that that was part of the contract, that you let them know that there was an administrative duty and that they ought to preserve documents as part of the contract. Is that right? Yes. Because I'm looking at the contract and I don't see that anywhere in the contract. The only thing I can find is that you all have the right during normal business hours to come back and look for documents, but I can see nothing that suggests any documents ought to be maintained by virtue of anything. What the Mentor Purchase Agreement said, and I'm not reading... It's at 3072, if that would help you. I mean, because just saying you can do whatever you want with documents, but if I happen to come back during normal business hours, you have to let me look for them,  Well, SKS is a company that is well-experienced with anti-dumping duty reviews. They would know what is involved in preparing the database and in providing information in response to dumping reviews. And, in fact, based on this agreement, CPB was able to provide complete questionnaire responses to Commerce and two more reviews in the 2007 and 2008 review and 2008-2009 review. It was the data between affiliated parties, which is the data issue here. It's prices between CPB, the unaffiliated importer, and PEER. That information is not typically used by the department. The department does not use prices between affiliates because they're not considered arm's length. So the information that was preserved had to do with the sales data in the United States. It had to do with factors of production data. While the contract is not worded exactly as Your Honor has suggested, due to preserved records, SKS knew what responding to anti-dumping duty requests would entail, and there was an understanding. And, in fact, that understanding is confirmed by the fact that it was able to respond in two subsequent reviews and provide school information. Okay. Thank you. Thank you. Thank you, Your Honor. I would like to start with addressing this idea that any obligation to maintain the information at issue here would be some open-ended, broad obligation to maintain all information that ever could possibly be imagined to be asked. That's not true. What we have here is information that is at the center of a dumping calculation, which is U.S. sales price, information that questions about it had been raised during the review, so the respondent was well aware that it was an issue, and the fact that Timpkin raised this in a case briefing and requested that Commerce treat the sales as export-priced sales for the final determination, there's a very real possibility that Commerce could choose to do so. And when the case went to litigation, as I mentioned, the sales were the center of the dispute, the questions raised on litigation, and, in fact, in its memorandum in support of its motion for judgment on the agency record that CPD submitted to the Court of International Trade, they faulted Commerce's application of facts available because Commerce had failed to request this information. They said Commerce can't do this because the information wasn't requested here. So they clearly knew that this information, you know, if the case was to be remanded, that Commerce may come back and say, okay, we couldn't apply it then because we hadn't requested this information, so we're requesting it now. At what point in the process was that? This was before the CIT, so this was after the initial briefs that were submitted to the Court of International Trade. After the first Commerce action that was appealed? Because this is like ping-pong. Yes, Your Honor. Correct, Your Honor. So Commerce issued a final determination in which they classified the sales as export-priced sales. Then in the very first stages of litigation, when CPD initiated in their initial, in their very first brief, to the Court of International Trade, they challenged, and part of what they challenged, was Commerce's use of facts available in a final determination, and they said you can't apply facts available here because you never requested this information. So that certainly raised, they certainly were aware that on remand. And did the sale occur before or after that point in time? This was after the sale had been made. So the sale was in September of 2008, which was after Commerce's preliminary determination, but before Commerce's final determination. So the respondents here were aware that this information was at the very center of the dispute, and as Judge Moryu indicated in Ta-Chin, we had a similar sequence of questioning where in Ta-Chin and here, there was this initial questionnaire where Commerce provided its general questions, but Commerce did not come back and specifically requested information again until the remand proceeding. And in Ta-Chin, this Court said that it's entirely reasonable for Commerce to expect that such information would be maintained here, and that's exactly what happened in our case. On remand, they requested it, and Commerce said it was certainly reasonable for them to expect that the information would be maintained. One final point I would like to make, and this is CPD's reliance on Commerce's use of constructed export price sales in the prior administrative reviews in which CPD has participated. I would just note there that a review of the record in those proceedings does not provide any information that there was this unaffiliated importer transaction in existence, and thus there appears to be a distinction in fact between the prior proceedings and this proceeding, which would support Commerce's different statement in the prior proceedings compared to the prior proceedings. Thank you. Okay, thank you. Thank you both. Yeah, I wanted to say, you guys were both awesome. You were extremely well prepared and fabulous. You helped me understand very complicated concepts, and thank you for doing such a great job. Okay, thank you all. The case is taken under submission. Thank you. Thank you. Thank you.